# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO NAVY BROADWAY
COMPLEX COALITION,

                                    Plaintiff,

        vs.

U.S. DEPARTMENT OF DEFENSE; et al.,

                                    Defendants.

CASE NO. 11cv0154 JM(WMc)

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT; DENYING
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

        Plaintiff San Diego Navy Broadway Complex Coalition ("NBCC" or "Plaintiff") moves for summary judgment on its National Environmental Policy Act ("NEPA") claims.  Defendants U.S. Department of Defense; Robert M. Gates, in his official capacity as Secretary of the U.S. Department of Defense; U.S. Department of the Navy; Ray Mabus, Jr., in his official capacity as secretary of the U.S. Department of the Navy; Naval Facilities Engineering Command; Christopher Mossey, in his official capacity as Commander of the Naval Facilities Engineering Command; Naval Facilities Engineering Command Southwest; and S. Keith Hamilton, in his official capacity as Commander, Naval Facilities Engineering Command Southwest (collectively "Federal Defendants") cross move for summary judgment on the NEPA claims.  Having carefully considered the record in its entirety, pertinent legal authorities, the arguments of counsel and for the reasons below, the court denies Plaintiff's motion for summary judgment on all claims and grants the Federal Defendants' motion for summary judgment on all claims.  The Clerk of Court is instructed to close the file.

**BACKGROUND**

On January 25, 2011, NBCC commenced this action against the Federal Defendants seeking declaratory and injunctive relief for alleged violations of NEPA and the Administrative Procedures Act ("APA").  The present action comes before the court following this court's June 26, 2008 order granting summary judgment in favor of NBCC on its public notice and participation claim and remanding the matter to the agency for compliance with the notice and public participation requirements of NEPA.  The parties in the earlier filed action, <u>San Diego Navy Broadway Complex Coalition v. U.S. Dept. of Defense, et al.</u>, No. 07cv0038 JM(WMc), jointly filed a motion to dismiss all claims without prejudice except the public notice and participation claim which was dismissed with prejudice.

The following facts are undisputed.

<u>Overview</u>

The Navy Broadway Complex ("NBC") site, located on federally owned land in downtown San Diego, presently consists of Navy administrative facilities including the Commander, Navy Region Southwest, and the Fleet Industrial Supply Center San Diego.  (Administrative Record, "AR," 80468).  The present Navy facilities, constructed primarily between 1921 and 1944, consist of 361,000 SF of administrative office space and 500,000 SF of warehouse space.      The proposed action includes the development of up to 3.25 million SF with approximately 1 million SF of Navy administrative space.  (AR 80469).

In 1982 the Department of the Navy considered options for the consolidation of various Navy installations in the San Diego area.  In light of budget constraints, the Department of the Navy pursued a "co-location" program which allowed the federal government to retain title to real property and to lease portions of the property for private revenue-generating uses that could be used to offset the cost of new administrative facilities.  (AR 80482-83).  Congress enacted legislation in 1986, Public Law 99-661, § 2732, 100 Stat 3816 (1986), authorizing the Secretary of the Navy to pursue a public-private venture to implement the co-location concept at the NBC site.  The legislation mandated that "any real property leased shall be developed in accordance with detailed plans and terms of development which have been duly formulated by the Navy and the San Diego community through the San Diego

1   Association of Government's Broadway Complex Coordination Group."  Id.

2       To obtain the objective of updated Navy administrative facilities, an advisory group, the

3   Broadway Complex Coordinating Group ("BCCG"), formed in 1985 under the auspices of the San

4   Diego Association of Governments ("SANDAG") to serve as community advisors for the planning

5   of the NBC site and to initiate consultation with local governmental authorities.  In June 1987 the

6   Navy and the City of San Diego executed a Memorandum of Understanding ("MOU") to establish the

7   terms of potential future development on the NBC site.  (AR 956-62).  On September 22, 1989 the

8   BCCG adopted the design principles for the NBC site and established detailed plans and development

9   terms required by the legislation.

10      Initial Environmental Review Proceedings

11      To comply with its environmental obligations under NEPA, the Navy completed an

12  Environmental Impact Statement ("EIS") in 1990 and issued a Record of Decision ("ROD") in July

13  1991.  (AR 80480-82). The EIS evaluated six action alternatives, in addition to the no action

14  alternative, and discussed a full range of environmental issues.  The ROD memorialized the Navy's

15  decision to redevelop the NBC site and identified essential uses for the site.  The ROD also identified

16  that the next step in the process was for the Navy and the City to enter into a Development Agreement

17  ("DA"), as contemplated under the 1987 MOU.  Among other things, the MOU provided that the

18  Navy, in consultation with the City, would prepare a development plan and urban design guidelines

19  (i.e. land uses, density, viewscapes, building heights, open space, etc.).

20      After review and consideration of potential adverse environmental impacts to the project, the

21  City completed an Environmental Impact Report in 1991.  A mitigation monitoring program ("MMP")

22  was prepared as part of the environmental review.  (AR 13196.).  The City and the Navy agreed that

23  all required environmental processing had been completed and that no further environmental review

24  would be required.  Id.  In October 1991 the California Coastal Commission issued a consistency

25  determination, agreeing that the development of the NBC was consistent to the maximum extent

26  practicable with the state's coastal zone management plans.

27      Following further public review, on November 2, 1992 the City enacted an ordinance

28  approving the DA for the NBC site.  The DA incorporated, among other documents, the MMP and

provided a guide to the planning and approval process for the project. The DA includes a development plan, urban design guidelines, and phasing for the project. The DA contemplates the development of 3.25 million SF with about a third of the development for use by the Navy, about 1.65 million SF for office space and about 1.2 million SF for hotel and retail uses. (AR 33477-87). The DA also requires 1.9 acres of public open space.

The original DA provided for the termination of the DA by January 1, 2002 unless a Developer Lessee was selected and recorded. (AR 33443). Following public hearings, the original deadline was extended first to January 1, 2003 and later to January 1, 2007. (AR 33489).

Subsequent Environmental Review Proceedings

By 2004 the real estate market in San Diego improved, and the Navy took steps to implement the DA. (AR 30918). Further, in 2005 the Base Realignment and Closure Commission ("BRAC") issued a directive to the Secretary of the Navy to either implement the DA or close the NBC and relocate the units and functions of NBC to other Department of Navy owned sites in San Diego. (AR 30908). To facilitate implementation of the DA, the Navy prepared an Environmental Assessment ("EA") analyzing the environmental impacts associated with implementing the 1991 ROD and the 1992 DA. Concurrently with the preparation of the EA, the Navy, on March 31, 2006, selected Manchester Pacific  Gateway, LLC ("Manchester") to participate in exclusive negotiations for the NBC project. (AR 26615-16). With the selection of Manchester, work commenced on the design phase submissions to Centre City Development Corporation ("CCDC") for a consistency review and determination of conformity with the DA. (AR 33446-47).

Each design stage of the project had to be approved by CCDC for conformity to the standards and initial consistency determination.   Beginning in April 2006, the CCDC held five public workshops to display the plan proposed by the developer. (AR 33446-47). The CCDC also conducted public meetings wherein the NBC proposals were considered. Id. At these meetings, the public provided comments to the CCDC. Such comments were provided to the Navy for consideration in its NEPA process.

Pursuant to NEPA, on November 22, 2006, the Navy issued a Finding of No Significant Impact ("FONSI"). In summarizing the environmental effects of NBC, the FONSI concluded:

1

2

3

4
> The EA demonstrated that implementation of the proposed action, which includes measures to reduce or avoid impacts to the environment as defined in the Development Agreement, will not have a significant effect on the human environment, and therefore an EIS is not required. The EA revealed that with measures in place to reduce project impacts, and associated development-related best management practices, that there would be no significant impacts to environmental quality.

5 (AR 41805).    Shortly thereafter, the lease with Manchester was executed.  (AR 41786).

6      On January 7, 2009 Plaintiff commenced a case alleging that Defendants (1) failed to prepare

7 an Environmental Impact Statement ("EIS"); (2) failed to prepare a Supplemental Environmental

8 Impact Statement ("SEIS"); and (3) failed to allow public participation before making the FONSI.

9 (FAC ¶14-28.  As noted above, the court granted Plaintiff's motion on the public participation and

10 notice claim and did not reach the remainder of Plaintiff's claims.

11      The Environmental Review on Remand

12      In response to the court's 2009 order, the Navy produced a new draft EA, released for public

13 review on September 17, 2008. (AF 64920-5589).  The Navy held three public meetings and received

14 numerous comments.  (AR72311).  The Navy considered the comments and ultimately discussed in

15 greater detail, among other things, the project's Anti-Terrorism Force Protection ("ATFP") standards,

16 seismicity and soils, traffic and cumulative impacts.  (AR 80450-723).

17      Plaintiff now raises three principal challenges to the EA and FONSI: (1) Defendants failed to

18 adequately consider alternatives under NEPA; (2) Defendants failed to prepare a Supplemental

19 Environmental Impact Statement ("SEIS") based upon alleged significant new circumstances and

20 information relating to terrorism, climate changes, seismic hazards, traffic impacts, excessive

21 development and cumulative impacts; and (3) Defendants violated NEPA by prejudging the outcome.

22      The Manchester Submission in Support of Defendants' Motion for Summary     Judgment

23      Manchester appears as amicus curiae in this action.  Manchester brings to the attention of the

24 court a state court challenge brought by Plaintiff.  On February 20, 2007, Plaintiff commenced an

25 action against the City of San Diego as a respondent and defendant, and Manchester as the real-party-

26 in-interest.  Plaintiff brought its challenges to the project pursuant to the California Environmental

27 Quality Act ("CEQA").  Among other things, Plaintiff broadly argued that a SEIS was required due

28 to alleged significant new circumstances and information relating to terrorism, climate changes,

1    seismic hazards, traffic impacts, excessive development and cumulative impacts.  (Manchester NOL

2    Exh. A).  The California Court of Appeal affirmed the trial court's denial of Plaintiff's claims.  San

3    Diego Broadway Complex Coal. v. City of San Diego, 185 Cal. App.4th 924 (2010).  In large part

4    Manchester argues that the CEQA standards, like NEPA, prohibits the issuance of a SEIS in the

5    absence of substantial major revisions to the initial review,  Cal. Pub. Res. Code §21666; compare

6    with 40 C.F.R. §1502.9(c)(1), and that this court should not reach a contrary result.

7        The Save Our Waterfront and Downtown Homeowners Submission in Support        of Plaintiff's
     Motion for Summary Judgment
8

9        Save Our Waterfront and Downtown Homeowners ("Save") appears as amicus curiae in this

10   action. Relying exclusively on the Administrative Record, Save argues that NBC is particularly

11   vulnerable as a terrorist target; the EA did not adequately address terrorism related issues; the ATFP

12   standards adopted and applied to the project are only the minimum standards and fail to adequately

13   protect the civilian public from potential terrorist attacks; the EA does not adequately address the

14   capabilities of first responders to a terrorist attack; and that the EA fails to analyze the impacts of the

15   location of the NBC project adjacent to a railway line which transports explosives and toxic gases.

16   The court only addresses those arguments raised by NBCC.

17                                    **DISCUSSION**

18   **Legal Standards**

19        Summary Judgment Standard

20        A motion for summary judgment shall be granted where "there is no genuine issue as to any

21   material fact and . . . the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P.

22   56(c); Prison Legal News v. Lehman, 397 F.3d 692, 698 (9th Cir. 2005).  The moving party bears the

23   initial burden of informing the court of the basis for its motion and identifying those portions of the

24   file which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v.

25   Catrett, 477 U.S. 317, 323 (1986).  There is "no express or implied requirement in Rule 56 that the

26   moving party support its motion with affidavits or other similar materials negating the opponent's

27   claim." Id. (emphasis in original).  The opposing party cannot rest on the mere allegations or denials

28   of a pleading, but must "go beyond the pleadings and by [the party's] own affidavits, or by the

1    'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that

2    there is a genuine issue for trial.'" Id. at 324 (citations omitted).  The opposing party also may not rely

3    solely on conclusory allegations unsupported by factual data.  Taylor v. List, 880 F.2d 1040, 1045 (9th

4    Cir. 1989).

5        The court must examine the evidence in the light most favorable to the non-moving party.

6    United States  v. Diebold, Inc., 369 U.S. 654, 655 (1962).  Any doubt as to the existence of any issue

7    of material fact requires denial of the motion.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255

8    (1986).  On a motion for summary judgment, when "'the moving party bears the burden of proof at

9    trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence

10   were uncontroverted at trial.'"  Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992) (emphasis

11   in original) (quoting   International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir.

12   1991), cert. denied, 502 U.S. 1059 (1992)).

13       Administrative Procedures Act Standard

14       In general, judicial review of actions under NEPA is governed by the Administrative

15   Procedures Act ("APA"), 5 U.S.C. §§551-559, 701-706.  The APA provides that any agency action

16   that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" is

17   prohibited and shall be overturned by the court.  5 U.S.C. §706(2)(A); California v. Norton, 311 F.3d

18   1162, 1170 (9ᵗʰ Cir. 2002).  "NEPA does not mandate particular substantive results, but instead

19   imposes only procedural requirements." Laguna Greenbelt, Inc. v. U.S. Dept. Of Transp., 42 F.3d 517,

20   523 (9ᵗʰ Cir. 1994).  Under this standard, the "court is not to substitute its judgment for that of the

21   agency."  Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43

22   (1983).  Nevertheless, "the agency must examine the relevant data and articulate a satisfactory

23   explanation" for its decision and, in reviewing that explanation, the court must consider whether the

24   decision was based on a consideration of the relevant factors and whether there was a clear error in

25   judgment.  Id.  This inquiry must "be searching and careful" but "the ultimate standard of review is

26   a narrow one."  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); Natural

27   Resources Defense Council, Inc. v. Hodel, 819 F.2d 927, 929 (9th Cir. 1987) (the court applies

28   deferential standard of review to Environmental Impact Statements).

1

2

3

4

5

6

> When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. On the other hand, in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance - - or lack of significance -- of the new information. A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation 'of the relevant factors.'

7    Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1988).

8         In considering a NEPA challenge, the court "may not substitute its judgment for that of the

9    agency concerning the wisdom or prudence of a proposed action." Laguna Greenbelt, 42 F.3d at 523

10   (quoting Oregon Envtl. Council v. Kunzman, 871 F.2d 484, 492 (9th Cir. 1987)). Under the "rule of

11   reason," the court determines "'whether the [EIS] contains a reasonably thorough discussion of the

12   significant aspects of the probable environmental consequences' by making 'a pragmatic judgment

13   whether the [EIS's] form, content and preparation foster both informed decision-making and informed

14   public participation.'" Id. (quoting Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346,

15   1356 (9th Cir. 1994)). Review under the rule of reason and for abuse of discretion "are essentially the

16   same." Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001). The role of the court "is to

17   ensure that the agency has taken a hard look" at the environmental effects. Or. Natural Res. Council

18   v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997).

19        An EIS is required "for major Federal actions significantly affecting the quality of the human

20   environment. . . ." 42 U.S.C. §4332(2)(C). To determine whether an EIS is required, the agency may

21   first prepare an EA. 40 C.F.R. §1501.4(b). An EA, like that at issue here, is a "concise public

22   document" that briefly describes the proposal, examines alteratives, and considers environmental

23   impacts to determine whether an EIS is required. 40 C.F.R. §1508.9. If the agency determines that

24   an EIS is not required, it issues a FONSI. 40 C.F.R. §1501.4(e), §1508.13. To challenge an agency's

25   decision not to prepare an EIS, a plaintiff need not show that significant effects will in fact occur, only

26   that there are "substantial questions whether a project may have a significant effect" on the

27   environment. Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998).

28   / / /

1  **The NEPA Claims**

2         Plaintiff raises three essential NEPA challenges to the adequacy of the environmental review:

3  (1) the failure of the EA to consider any alternative except the "No Project" alternative; (2) the failure

4  to prepare a SEIS in light of new circumstances and information; and (3) Defendants allegedly

5  prejudged the outcome of the EA in violation of NEPA by entering into a long-term lease with

6  Manchester prior to completion of the 2009 EA.[1]

7         Consideration of Alternatives

8         Under the Council on Environmental Quality ("CEQ") regulations, every environmental

9  assessment must "include brief discussions of . . . alternatives as required by section 102(2)(E) [of

10 NEPA]." 40 C.F.R. § 1508.9(h). Pursuant to NEPA, all federal agencies "shall . . . study, develop,

11 and describe appropriate alternatives to recommend course of action in any proposal which involves

12 unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

13 While the CEQ regulations do not create a "numerical floor on alternatives to be considered," all

14 reasonable alternatives must be considered and "an appropriate explanation" must be given for

15 alternatives that are eliminated. Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1246

16 (9th Cir. 2005). "An agency must look at every reasonable alternative, with the range dictated by the

17 nature and scope of the proposed action." Northwest Envt'l Def. Ctr. v. Bonneville Power Admin.,

18 117 F.3d 1520, 1538 (9th Cir. 1997) (quoting Idaho Conservation League v. Thomas, 956 F.2d 1508,

19 1520 (9th Cir. 1992)).

20        Plaintiff contends that the EA impermissibly limited the number of alternatives considered to

21 two: the preferred project and the "no project" alternative and therefore the Navy failed to comply with

22 its NEPA obligations. Plaintiff contends that Defendants could have considered, at a minimum, the

23 following two alternatives: (1) construction of the Navy facilities at another unidentified federally

24 owned site; and (2) a lesser development and intensity of the site.

25        With respect to construction of the project at another federally owned site as a contemplated

26 alternative required to comply with NEPA, the court concludes that Defendants did not act arbitrarily,

27

28        [1] The parties agree that Defendants complied with their public notice and participation obligations under NEPA.

1   capriciously, or contrary to law by not considering another site other than the Broadway site.  The

2   National Defense Authorization Act of 1987 authorizes the development of Navy administrative

3   facilities at the Broadway Complex site and only then if the terms of the development are mutually

4   approved by the Navy and the City of San Diego.  Pub. L. No. 99-661, §2732(c).  Further, the DA also

5   provided for the development to proceed at the Broadway site.

6       The nature and scope of the proposed action is clearly defined: (1) to comply with the

7   Congressional mandate; (2) to consolidate Naval shore administrative activities; (3) to provide

8   efficient centralized administrative facilities to serve the many Navy installations in the San Diego

9   area; and (4) to provide the Navy facilities at reduced or no cost to the taxpayer.  (AR 80468).  The

10  court notes that there is no evidence before the court suggesting that any other potential site satisfies

11  the nature and scope of the proposed action, particularly in light of the Congressional mandate.

12      Under the rule of reason standard,  Laguna Greenbelt, 42 F.3d at 523, limiting the alternatives

13  to only the NBC site complies with NEPA.  As set forth in the 2009 EA, absent development of the

14  NBC site, the Navy would require a significant funding increase to bring the existing buildings "up

15  to a reasonable level of modernity and efficiency [and] cost the taxpayer a significant amount of

16  money."  (AR 80495).[2]  The court concludes that limiting the alternatives to a choice between the

17  NBC site  or the so-called no action alternative, in light of the nature and proposed scope of the project

18  alternative, is not arbitrary, capricious, nor contrary to law.

19      The court also rejects Plaintiff's contention that Defendants arbitrarily failed to consider a

20  lesser intensity of development.  After "the 1990 EIS was completed and the ROD issued, the decision

21  on intensity of development suitable for the purpose and needs of that project had been made.  An

22  examination of alternatives which didn't meet that standard, such as less intense development was not

23  warranted."  AR 13197.  In other words, the Navy considered that a reduced density would not likely

24  attract a qualified developer or comply with the nature and scope of the proposed action.

25      Here, looking to the nature and scope of the proposed project,  Northwest Envt'l Def. Ctr., 117

26  F.3d at 1538,  the overarching goal is to achieve the Congressional mandate consisting of the

27

28      [2] The court notes that the 1990 EIS considered and rejected six alternatives as infeasible.  (AR
        1663-1720).

1   construction of new Navy administrative facilities, at no or minimal cost, in consideration for a long-

2   term lease of the NBC property to a private party.  Pub. L. 99-661, §2732.  The Navy's determination

3   that the existing intensity of use is adequate to achieve the purpose and needs of the project, and that

4   a lesser intensity would not satisfy the Congressional mandate, is not arbitrary, capricious nor contrary

5   to law.  NEPA only requires consideration of reasonable alternatives.  Native Ecosystems Council v.

6   U.S. Forest Service, 428 F.3d 1233, 1246 (9th Cir. 2005)  In Native Ecosystems, the Ninth Circuit

7   noted that there is no "numerical requirement" in determining whether the agency acted reasonably

8   in analyzing available alternatives  and that the "obligation to consider alternatives under an EA is a

9   lesser one than under an EIS."  Id.  There, the Ninth Circuit concluded that consideration of the no-

10  action and a preferred alternative, as here, did not violate NEPA, finding that "[s]o long as 'all

11  reasonable alternatives' have been considered and appropriate explanation is provided as to why an

12  alternative was eliminated, the regulatory requirement is satisfied."  Id.

13          Finally, the court notes that Plaintiff fails to identify any other reasonably available alternative

14  that would comply with the legislative mandate.  Notwithstanding, Plaintiff asserts that the "real

15  reason for ignoring the alternative is that Defendants had already entered into a lease that allowed for

16  development within the parameters of the Development Agreement, so there was no reason in their

17  minds to look at an alternative outside their previous commitment."  (Reply at p.6:11-14).  This facile

18  argument ignores the legislative mandate and the several environmental studies carried out before

19  executing the lease agreement with Manchester, including consideration of six alternatives as set forth

20  in the 1990 EIS.  (AR 1641-1772).

21          In sum, the court finds that Defendants' consideration of the identified alternatives is neither

22  arbitrary or capricious nor does it violate NEPA.

23          Preparation of a SEIS

24          Plaintiff contends that Defendants violated NEPA by preparing the 2009 EA instead of a SEIS.[3]

25  A SEIS is only required where the agency makes substantial changes in the proposed action relevant

26  to environmental concerns where significant new information arises relevant to environmental

27

28          [3] The court notes that Plaintiff withdrew its challenges to the adequacy of the EA based upon
        seismic hazards and traffic.  (Reply at pp. 10:26-11:3).

1    concerns and the changes or "new information is sufficient to show that the remaining action will

2    affec[t] the quality of the human environment in a significant manner or to a significant extent not

3    already considered." Marsh, 490 U.S. at 374; 42 U.S.C. §4332(2)(C).  Plaintiff contends that the

4    following impacts, either individually or collectively, require Defendants to prepare a SEIS.

5                    **Terrorism**

6            Plaintiff and Amicus Curiae, Save, argue that the level of analysis on terrorism provided for

7    in the EA is insufficient and that a SEIS is required.  A report submitted by Plaintiff during the review

8    process indicates that the NBC site is a potential terrorist target.  (AR 67156 - 163).  The report,

9    authored by Brian Michael Jenkins, an advisor on terrorism and military related issues, noted that it

10   is "unusual for major military facilities to be located in the heart of urban areas." Id.  He also opines

11   that the proximity of NBC to civilian hotels and retail facilities "increases the risk for those facilities"

12   and that "security for the new Navy headquarters will have to take into account a range of possible

13   incidents or modes of attack," such as violent protests; assaults of naval personnel; bombings;

14   shooting; arson attacks involving rail tankers; rocket and mortar fire; and chemical, biological, or

15   radiological weapons. Id.

16          Plaintiff also identifies publications issued by the Department of Justice and the Federal

17   Emergency Management Agency which identify the need and methods for conducting terrorist threat

18   assessments.  Plaintiff also correctly argues that NEPA requires federal agencies, where practicable,

19   to consider potential environmental impacts of terrorist attacks on potential targets.  In San Luis

20   Obispo Mothers of Peace v. Nuclear Regulatory Comm'n, 449 F.3d 1016 (9th Cir. 2006) the Nuclear

21   Regulatory Commission ("NRC") categorically determined that NEPA did not require consideration

22   of the environmental effects of potential terrorist attacks primarily because "the possibility of a

23   terrorist attack . . . is speculative and simply too far removed from the natural or expected

24   consequences. Id. at 1030. The Ninth Circuit rejected NRC's argument. The Ninth Circuit considered

25   NRC's post-September 11, 2001 policy opinion that the NRC should engage in a comprehensive

26   review of its terrorist threat assessment framework and design basis threat.  It also noted that the NRC

27   had established an Office of Nuclear Security and Incident Response to coordinate and implement a

28   comprehensive security review applicable to all facilities. Id. at 1031.  The Ninth Circuit determined

1    that it could not reconcile NRC's argument that any terrorist attack on nuclear facilities was so remote

2    with its stated policy goals to perform a top-to-bottom review of terrorist attacks.  The Ninth Circuit

3    then concluded that "NEPA obligates the NRC to take a 'hard look' at the environmental

4    consequences of that risk," even if precise quantification of that risk is not ascertainable.  Id. at 1032.

5           Upon remand, the NRC conducted a further review of the potential radiological impact of

6    potential terrorist acts on spent fuel storage casks.  San Luis Obispo Mothers for Peace v. Nuclear

7    Regulatory Comm'n, 635 F.3d 1109 (9th Cir. 2011) ("Mothers for Peace II").   Using generic

8    assessments of radiological dose calculations, the NRC concluded that there would be no significant

9    impact on the environment.  Id. at 1112. The Ninth Circuit concluded that NRC complied with NEPA

10   when it considered the evidence regarding a potential terrorist threat (even though the information

11   could not be disclosed at a public hearing because of the sensitive nature of the terrorism information).

12   Noting the Supreme Court's admonition against imposing additional procedures on agencies' NEPA

13   decision-making determinations, the Ninth Circuit rejected the plaintiff's argument that there was no

14   reasoned basis for NRC's determination and concluded that the NRC did not abuse its discretion in

15   not disclosing sensitive information and finding the evidence did not alter the FONSI.  Id. at 1120.

16          In the main, Plaintiff argues that the expansion of the Navy's presence in downtown San Diego

17   presents and/or increases the potential threat of a terrorist attack.  Plaintiff then argues that the level

18   of analysis in the EA does not comply with NEPA.  For example, Plaintiff argues that NBC must "be

19   the subject of comprehensive threat and vulnerability assessments" that include "violent protests;

20   assaults or assassinations of naval personnel; bombings; shootings; arson attacks involving tankers;

21   rocket and mortar fire; and chemical, biological, or radiological weapons."  (Reply at p.9:9-11).  The

22   court concludes that the level of detail and depth of analysis demanded by Plaintiff exceeds the scope

23   and demands of NEPA.

24          Here, the level of analysis provided by Defendants exceeds that identified in Mothers for Peace

25   II.  The court concludes that the Navy took a hard look at the environmental consequences of potential

26

27

28

1    terrorist attacks and adopted standards to address potential terrorist concerns.[4]   See Kleppe v. Sierra

2    Club, 427 U.S. 390, 410 n.21 (1976) ("The only role for a court is to insure that the agency has taken

3    a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of

4    the executive as to the choice of the action to be taken.'").   The EA directly addressed issues of

5    terrorism and concluded that the NBC site would comply with ATFP (antiterrorism for protection

6    building standards)  and that the "proposed action . . . would not jeopardize the national security of a

7    military installation or the safety of our citizens."   (AR 80518-19).   In reaching its conclusions,

8    Defendants relied upon its own experts by having the threat independently evaluated by the Naval

9    Criminal Investigative Service ("NCIS") and by considering public comments concerning potential

10   terrorist threats, including those of Brian Jenkins.  (AR 69867; 80518-23; 81426; 81214; 81157). See

11   Marsh, 490 U.S. at 378 ("[A]n agency must have discretion to rely on the reasonable opinions of its

12   own qualified experts even if, as an original matter, a court might find contrary views more

13   persuasive.").

14         Finally, the court notes that the same naval administrative services that are currently located

15   on the NBC site will remain after construction of the project.  In this sense, the potential terrorist threat

16   remains essentially the same, except that the administrative services will be located in modern,

17   improved, and higher security facilities.[5]  Where, as here, "the proposed action does not significantly

18   alter the status quo, it does not have a significant impact under NEPA" and a SEIS is not required.

19   TriValley CAREs v. Dep't of Energy, 671 F.3d 1113, 1125 (9th Cir. 2012).

20         In sum, the court concludes that Defendants took a hard look at the environmental

21   consequences of potential terrorist attacks by relying on the expertise of NCIS, adopting the ATFP

22   standards, and considering extensive public input on the issue of terrorism.

23   _____

24        [4] The court notes that the terrorism risks are of low probability, as identified in the report
     prepared by Brian Jenkins.  (AR 67157).  While there is no specific known terrorist risk to the NBC
25   site, the Jenkins report notes that "[i]t is extremely difficult to assign a statistical probability to a
     terrorist attack on any specific facility."  Id.
26

27        [5] While Plaintiff argues that NBC is "slated to become the Navy's center for logistics for the
     global war on terror," (Motion at p.17), the court notes the administrative record indicates that the
28   NBC site "would be limited to administrative functions that are not directly involved in ongoing
     combat missions."  (AR 80519).

11cv0154

**Climate Change**

Plaintiff contends that the 2009 EA fails to adequately address global warming and climate change impacts related to the NBC such that a SEIS is required.  Plaintiff represents that the project will emit about 68,893 metric tons of greenhouse gases and that the EA fails to quantify any proposed reduction in greenhouse gases.

The court concludes that Defendants took a hard look at the environmental consequences of greenhouse gases and climate changes.  The EA sets forth an eleven-  page discussion of climate change issues.  While the majority of this discussion concerns global climate change in general, the EA identifies actions to be taken to reduce the number of vehicle trips to the site thus reducing greenhouse gases.  The EA also discusses regulations for building energy efficiency, fuel efficiency for vehicles, and renewable energy, among other things.  (AR 80718 - 19).  The EA also highlights that, "because of the uncertainties involving the assessment of such emissions regionally and globally, the incremental contribution of this proposed action on global climate change cannot be determined given the current state of the science and assessment methodology."  (AR 80720).

In sum, the court concludes that the EA adequately considered the project's impact on global warming in proportion to its significance.

**Excessive Development Intensity and Cumulative Impacts**

Plaintiff argues that the project's cumulative impacts in conjunction with the planned construction of a cruise ship terminal and other proposed developments in the Marina District have not been adequately studied and warrant a SEIS.  NEPA defines a cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions."  40 C.F.R. §1508.7.  In particular, Plaintiff identifies that the Midway Museum is located directly across from the projects, which is a view corridor to be implemented when the NBC is built.  Plaintiff also identifies that a planned cruise ship terminal at Broadway Pier will also impact the views.

The court finds that the EA took a hard look at potential future developments and considered the cumulative impacts of the project.  The 2009 EA considered the visual environment in the NBC

1    area, including the Midway Museum corridor, the Cruise Ship Terminal and other berthing along the

2    waterfront.  The EA considered the project viewshed and aesthetics.  (AR 80542- 57).  Not only does

3    the EA discuss the rapid development that could impact view corridors along the waterfront, (AR

4    80704-07), but it also discusses the DA and the "design criteria to preserve and reinforce the existing

5    views and to capture new views as redevelopment on large waterfront parcels [] occurs."  (AR 80544).

6    The EA focused on the aggregate effects to aesthetics and viewshed, rather than reviewing individual

7    past or present developments, and specifically identified those developments included in the North

8    Embarcadero Alliance Visionary Plan ("NEAVP").  The NEAVP plan contemplates the expansion of

9    the cruise ship terminal, including the development in the waterfront area of other commercial uses

10   and public amenities.  (AR 7744-64).  The NEAVP also discusses  substantial redevelopment of the

11   B Street Pier (about one block from the NBC site) noting that the size and configuration, and the

12   nature of other commercial development on the pier, will be based on the future needs of the cruise

13   ship industry in San Diego.  (AR 7780).  Under these circumstances the court concludes that

14   Defendants took a hard look at both anticipated and unanticipated development intensity and

15   cumulative impacts of the NBC.

16           In sum, the court concludes that a SEIS is not required under NEPA because Defendants'

17   decision was based on consideration of relevant factors and the actions were not arbitrary, capricious,

18   nor a violation of law.

19           Defendants' Prejudgment of the Outcome

20           Plaintiff contends that the entire review process is, as a matter of law, defective under NEPA

21   because Defendants prejudged the outcome of the 2009 environmental review process.  The only fact

22   supporting this argument is that Defendants entered into a lease agreement with Manchester in 2006.

23    Seen in context of the entirety of the record, this argument is not significant nor persuasive and does

24   not undermine the court's conclusion that Defendants' took a hard look at relevant NEPA

25   environmental considerations.

26           As noted in Metcalf v. Daley, 214 F.3d 1135 (9th Cir. 2000) "[p]roper timing is one of NEPA's

27   central themes.  An assessment must be 'prepared early enough so that it can serve practically as an

28   important contribution to the decisionmaking process and will not be used to rationalize or justify

1  decisions already made." Id. at 1142.  In Metcalf the Ninth Circuit concluded that the federal
2  defendants did not engage the NEPA process "at the earliest possible time."  Rather, the "Federal
3  Defendants did not even consider the potential environmental effects of the proposed action until long
4  after they had already committed in writing to support the Makah whaling project." Id. at 1143.  It was
5  only after NOAA had signed a contract with the Makah that it commenced the environmental review
6  process.

7          Here, in contrast to Metcalf, Defendants commenced the NEPA review process more than 16
8  years before entering into the lease with Manchester.  At the earliest possible time, in October 1990,
9  Defendant completed an EIS, considering a full range of environmental issues. (AR 1665-1770). The
10  ROD, issued in July 1991, adopted the preferred alternative identified in the 1990 EIS (which is
11  essentially the current preferred alternative).  Defendants continued to pursue environmental review
12  of the NBC project by obtaining a consistency determination from the California Coastal Commission
13  in October 1991.  Meanwhile, Defendants and the City of San Diego jointly developed the DA in 1992.
14  Significantly, the scope of the present NBC project remains as first contemplated in 1990.  The record
15  also shows that the Navy completed the 2006 EA prior to entering into the Manchester lease.  This is
16  not the case where, like Metcalf, the NEPA process was found to be driven by the parties' agreement.
17  Instead, the Manchester lease was driven by the NEPA process.   The record demonstrates that
18  environmental review was conducted by Defendants at the "earliest possible time to insure that
19  planning and decisions reflect environmental values."  Audrus v. Sierra Club, 442 U.S. 347, 351
20  (1979).

21          The court notes that several other factors unrelated to NEPA led to signing of the Manchester
22  lease.  First, the DA originally required any development lease to be signed by January 1, 2002.  The
23  deadline was extended to January 1, 2003 and then again to January 1, 2007. (AR33489-97).  Second,
24  in 2005, the Base Realignment and Closure Commission issued a directive requiring the Secretary of
25  the Navy to either implement the 1992 DA or to close NBC.  (AR 30908).  Even under pressure arising
26  from the expiration of the deadlines in the DA and the Base Realignment and Closure Commission,
27  Defendants did not enter into a lease agreement with any developer.  Only after completion of the 2006
28  EA did Defendants enter into the lease agreement with Manchester.

1    In sum, the court concludes that the NEPA review process conducted by Defendants was not,

2   based upon the entirety of the record, untimely nor improperly influenced by the 2006 Manchester

3   lease.

4   **The Request for Judicial Notice**

5    Plaintiff moves the court to take judicial notice of (1) the Manchester ground lease and (2) a

6   10News story re: U.S. Geologic Survey's opinions by Susan Hough.  The court denies the request for

7   judicial notice, not because the ground lease is not properly subject to judicial notice under FRE 201,

8   but because Plaintiff fails to show that expansion of the Administrative Record is warranted under the

9   circumstances.[6]

10    Expansion of the Administrative Record is appropriate under limited circumstances (1) to

11   explain agency action; (2)where the agency relied upon documents not included in the record; (3) to

12   explain or clarify technical terms; or (4) where there is a strong showing in support of a claim or bad

13   faith or improper behavior.  Sw. Ctr. For Biological Diversity v. U.S. Forest Serv., 100 F.3d 1442,

14   1450 (9th Cir. 1996).  Here, Plaintiff argues that the "ground lease explains that the 2009 environmental

15   assessment process was nothing more than a charade." (Oppo at p.2:15-16).  This bare assertion does

16   not point to any provision in the lease that explains Plaintiff's conclusion that the 2009 EA is a

17   charade.  As Plaintiff's conclusory mischaracterization of the Manchester lease does not explain

18   agency action or support a claim of improper behavior, the court grants Defendants' motion to strike

19   the extra record material filed by Plaintiff.

20    In sum, the court grants summary judgment in favor of Defendants and against Plaintiff on all

21   claims.  The Clerk of Court is instructed to close the file.

22    **IT IS SO ORDERED.**

23   DATED:  October 17, 2012

24                                                              _____

25                                                              Hon. Jeffrey T. Miller
                                                                United States District Judge

26

27    [6] The court notes that Plaintiff withdrew its challenge to the seismological survey conducted
     by Defendants. (Reply at p. 10:26-28).  Accordingly, the 10News story document is not relevant to any
28   issue before the court.